UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-81232-CIV-COHN/SELTZER

ALAN BENJAMIN JAET,

    Petitioner,

v.

IRIS BARZVI SISO, a/k/a
IRIS BARZVI JAET,

    Respondent.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS CAUSE is before the Court upon a bench trial held before the undersigned on December 29, 30 and 31, 2008. Petitioner Alan Jaet filed a Petition for the Return of Children pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (42 U.S.C. §§ 11601 et seq.) ("ICARA") [DE 1]. The Court has considered the testimony and other evidence presented by both parties at trial and the applicable law and is duly advised in the premises. Accordingly, pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law.

**I. FINDINGS OF FACT**[1]

1.    Petitioner Alan Jaet ("Petitioner" or "Mr. Jaet") and Respondent Iris Jaet ("Respondent" or "Ms. Jaet") were divorced in May of 2008 in Mexico City, Mexico, in the country in which they resided with their three children, S.J. (age

---

[1] Any of the foregoing factual findings that may represent conclusions of law are adopted as conclusions of law.

11), A.J. (age 9) and M.J. (age 7).  Exhibits 2 to 5; and Video Deposition of Ana Maria Kudisch.

2. The procedure in the Mexican court required Iris and Alan to appear before a family court judge and agree to their voluntary divorce settlement after the judge attempted to talk them out of the divorce.  Exhibits 3 and 5.

3. Respondent alleges that the divorce settlement was not entered into freely and voluntarily by Respondent, as Petitioner Alan Jaet acted as her interpreter, and she executed the documents "under duress and deception."

4. Respondent Iris Jaet testified that her ex-husband berated her daily to sign the divorce decree under threats that he would take the children away from her.

5. Alan Jaet testified that the divorce agreement was negotiated from January through April 2008, and that Iris consulted with her own divorce attorneys during the process.

6. Pursuant to the divorce decree, Mr. Jaet paid for the children's private school tuition, health insurance, medical care, a 500 square meter condominium (including maintenance and operations costs),[2] a live-in nanny, a driver, and 15,000 pesos per month of child support.

7. Despite her testimony regarding the agreement, Ms. Jaet has failed to present sufficient evidence for this Court to ignore the validity of the final divorce decree entered in Mexico.

8. The divorce decree contains detailed provisions for custody and visitation.

---

[2] The Court takes judicial notice that a square meter equals 10.76 square feet.

Although the mother retained primary custody, the father has unsupervised visitation on every Wednesday evening, two non-consecutive weekends per month, and alternate vacation periods.  Exhibit 12.

9. Mr. Jaet also testified that he had rights to unsupervised visitation at any time.

10. In mid-June of 2008, Ms. Jaet took the three children to the United States to visit her parents in the Southern District of Florida for her half of the summer vacation.

11. She did not return the children to Mr. Jaet in Mexico in mid-July of 2008 for his half of the summer vacation.

12. Ms. Jaet arranged in June of 2008, prior to their departure from Mexico, to obtain copies of the children's school and medical records.

13. Mr. Jaet timely exercised his parental rights by petitioning the appropriate authority in Mexico and the United States before the filing of this petition.

14. The instant Petition was timely filed on October 23, 2008.

15. The family's habitual residence was in Mexico City, Mexico, where the children attended school.

16. Ms. Jaet wrongfully retained the children in the United States in violation of the final judgment of divorce issued by a Mexican family court judge.

17. In her Answer to the Petition, Ms. Jaet alleges that the children will face a grave risk of psychological or physical harm if returned to Mexico.

18. Alan's parents, Lucy and Aaron Jaet, both testified via video-taped depositions that they never witnessed any acts of violence by Alan toward Iris or the children.

19. The generations of the Jaet family in Mexico are close knit with frequent visits by the minor children with their paternal grandparents and their first cousins on Mr. Jaet's side of the family, though there was also testimony that he was removed from his family's business about five years ago.

20. Lucy and Aaron Jaet spoke glowingly of their son's parenting skills.

21. The Jaet's nanny, Maria Margeurita Corona Jimenez, and driver Gonzalo Martinez Cortez, both testified that they never witnessed any acts of violence by Mr. Jaet. Depositions, Exhibits 25-27.

22. Both Alan and Iris Jaet testified regarding the events leading up to their divorce.

23. Mr. Jaet's testimony of this period from January through May of 2008 consisted of various allegations regarding Iris's fitness to be a parent.[3]

24. Ms. Jaet testified that a cycle of abuse of her and the children led her to seek the divorce.

25. In January of 2008, a few days after telling Mr. Jaet that she wanted a divorce, she left for New York for a few days, leaving the children with Mr. Jaet and the nanny, but returned early after attempting to reach her children by telephone.

26. Regarding Ms. Jaet's allegations of abuse, Mr. Jaet testified that he was the disciplinarian for the family and on occasion did resort to spanking the children with an open hand on their buttocks when verbal discipline failed. He also testified that Iris spanked the children as well, but preferred that he do it so her

---

[3] The Court does not consider these allegations in reaching its conclusions regarding the risk of harm to the minor children if returned to Mexico.

fingernails would not break.

27. There were no documented allegations of abuse prior to the divorce becoming final.

28. Ms. Jaet testified that she did not make any public reports of abuse because Mexico is "different," in that social services are directed toward the poor, are minimal at best, and are not available to wealthy families such as the Jaet family.

29. Ms. Jaet testified that Mr. Jaet's verbal abuse toward her began early in their marriage, shortly after the death of their newborn son in 1995, though she stayed in the relationship because he usually apologized and promised not to do it again.

30. She testified that the abuse of her and the children continued over the years, and intensified over the last five years.

31. She also testified that three times in her last year in Mexico she did telephone the police due to Mr. Jaet's outbursts but no one came to investigate.

32. She filed a petition for a domestic violence injunction against Mr. Jaet in Mexico criminal court on or about June 17, 2008, just prior to her departure for the United States on Friday, June 20, 2008, for her four week portion of the children's summer vacation, but was told her complaint would not be heard until later in the summer.

33. On cross-examination, Mr. Jaet denied repeated accusations by Ms. Jaet that he struck the children and called them names, other than the occasional disciplinary spanking.

34. Mr. Jaet testified that he loves his children, enjoys spending time with them, and wishes their prompt return to Mexico.

35. He testified that the children's school in Mexico has allowed the minor children up to a year's leave of absence, and that they can return to their school during that time, with additional tutoring for the Mexican portion of the curriculum.

36. Iris' mother, Rifka Barzvi, testified that Mr. Jaet engaged in repeated verbal discipline that bordered on over-reaction to seemingly minor childhood transgressions over the past . However, due to her husband's recent illness, Rifka Barzvi has visited Mexico only once in the last seven years, though Iris and the children have visited her in Florida each year for four weeks. Alan would spend about 10 days of these four weeks in Florida with his family and Iris' parents.

37. Mrs. Barzvi related several incidents over the past ten years of Mr. Jaet's fits of anger, including facial contortions that scared the children.

38. She also testified that the children's attitude has improved during their six months in Florida and that it would be very bad if the children, particularly A.J., were returned to Mexico with their father.

39. Iris' sister, Estee Barzvi Ziat, who lives in Mexico City, similarly testified to various instances of Mr. Jaet's angry outbursts at the children over the years, including the few instances of corporeal punishment.

40. Estee Ziat also testified that Alan Jaet confided in her regarding his own strict upbringing by his parents, Lucy and Aaron Jaet.

41. Neither Ms. Jaet's mother nor her sister called the police or child welfare authorities for any of these incidents, whether they occurred in Florida or Mexico.

42. Dr. Juliana Gerena, a forensic psychologist with expertise in evaluating children in potentially violent domestic situations, conducted an evaluation pursuant to Rule 35 of the Federal Rules upon being appointed by the Court upon motion by Respondent.

43. In preparing her sixty-five page report, Dr. Gerena spoke with the three minor children, both parents, all four grandparents, the children's teachers in Mexico and the United States, S.J's therapist in Mexico, the children's nanny and chauffeur in Mexico, and conducted various psychological tests upon the children.  Exhibit 29.

44. The physical abuse that the children reported to Dr. Gerena consisted of disciplinary related spanking, consistent with Alan Jaet's testimony.

45. The children also reported many instances of verbal abuse by the father of the mother, and many instances of the father exhibiting physical signs of anger, including clenching of the teeth, growling. and raising of his voice.

46. Dr. Gerena concluded that the children exhibited symptoms of anxiety.

47. There is no suggestion of sexual abuse in any of the children.

48. Dr. Gerena did conclude that M.J., the youngest child, did not exhibit any symptoms consistent with experiencing abuse.

49. Her psychological testing revealed that it was possible that the children witnessed domestic violence in Mexico.

50. As to S.J. and A.J., Dr. Gerena did find that the children have experienced trauma. However, possible causes of the trauma include separation from the father, the divorce of the parents, removal from Mexico, knowledge of court proceedings (including allegations of adultery and parental neglect), in addition to any harm caused by the father.

51. Dr. Gerena also reported that S.J. began therapy in Mexico due to fear of darkness, nightmares, and fear of being alone but that the therapist initially told Iris that the therapist did not have expertise in emotional issues, as she specialized in speech pathology.

52. Dr. Gerena spoke with S.J.'s therapist in Mexico, who did not report any physical abuse, though the therapist reported to Dr. Gerena that there was potential for domestic violence. The Mexican therapist, Dr. Fascovich, reported that S.J. reported that her father yelled at her and acted like a monster.

53. Dr. Gerena also reported that Dr. Fascovich reported that Iris Jaet was inconsistent with S.J.'s attendance at therapy, and that it appeared to the therapist that Iris was just as concerned with the impact of S.J.'s behavior on her, rather than with the impact on S.J.

54. Ms. Jaet testified that S.J. saw Dr. Fascovich for over one year (20 to 40 sessions), initially two times a week, and that Mr. Jaet was the one who withheld funding for these sessions, forcing Ms. Jaet to end the sessions before she and S.J. wanted to end the sessions.

55. S.J. did tell Dr. Gerena that she would rather kill herself than return to Mexico,

8

but she did not exhibit any present ideation or intent to commit suicide.

56. Based upon Dr. Gerena's interviews with the children's teachers, S.J. and A.J. are doing well in school here, while M.J.'s difficulties here are likely due to her skipping a grade in the transition.

57. Dr. Gerena expressed some concern about the children's re-integration into Mexico given alleged talk in their Mexican school about the circumstances of their departure and A.J.'s bullying behavior prior to departure, and the lack of trust toward the nanny and chauffeur given their testimony in this action.

58. Dr. Gerena reported that inconsistencies and contradictions limit the credibility of the allegations of Ms. Jaet against Mr. Jaet with regard to physical or psychological abuse of the children.

59. Dr. Gerena testified that S.J. and A.J. would suffer harm if they had to testify in open court before both parents.

60. Dr. Gerena could not give a definitive answer as to the ultimate question of whether the children had been abused in the past or whether they will face a grave risk of harm if returned to Mexico.

61. Dr. Gerena concluded that there was evidence that such abuse had occurred, but that there was also evidence that it did not occur.

62. Petitioner's retained psychological expert, Dr. Jerome Poliacoff, testified that Petitioner did not have a propensity of violence toward the children and would not pose a risk of harm.  Exhibit 31

63. The Court gives little, if any, weight to Dr. Poliacoff's conclusions as he let Mr.

Jaet redo certain answers to questions on the psychological tests that he administered, calling into question the validity of his results.

64. The Court finds that Mr. Jaet did engage in shouting episodes that were overreactions to relatively minor transgressions of the children.

65. Mr. Jaet has anger management issues which should be addressed by an appropriate mental health specialist.

66. The Court saw some evidence of Mr. Jaet's temper in eleven brief video recordings made by Ms. Jaet as impeachment evidence of Mr. Jaet (and four recordings of the Jaets' nanny, Maria Margeurita Corona Jimenez). Exhibit 36.[4]

67. With one exception, the video recordings of Mr. Jaet, made from January through March of 2008, merely present various arguments about the terms of the divorce and the future of the children. These arguments were made in a mixture of English and Spanish.[5]

68. There was one incident of a possible physical assault by Mr. Jaet following verbal

---

[4] The admission of the video recordings, submitted on a "DataTraveler" memory stick and not played at trial, was subject to a timely objection by Petitioner. Petitioner asserts that the recordings were made by Ms. Jaet without permission of either Mr. Jaet or the nanny, and as such are illegal recordings of sound and video and thus inadmissible. Respondent argues that Mr. Jaet at one point in one video clip acknowledges that he wants Ms. Jaet to turn her laptop computer off, indicating that perhaps he did know he was being recorded. Even assuming the recordings were made without permission, the Court concludes that Petitioner has failed to establish that the recordings are inadmissable in this court (the Court did review the unverified opinion of a Mexican attorney regarding the illegality of the recordings and his citation to Mexican Penal Code [DE 45].)

[5] The long discussions between the nanny and Ms. Jaet were entirely in Spanish.

provocation by Ms. Jaet, however, the video did not show what actually occurred. The Court could hear a woman and/or children screaming.

69. The Court allowed the children to testify in camera on request of Respondent, and over the objection of Petitioner. The parties did agree that it would be helpful if Dr. Gerena was present during this testimony. The testimony took place in the presence of the undersigned, Dr. Gerena and a court stenographer.

70. The Court finds each child capable of recollecting and narrating facts pertaining to the issues for the Court's determination. Each child possessed a sufficient moral sense of duty to tell the truth. Each child demonstrated a level of maturity far greater than their biological age. Therefore, the Court determines each child to be competent to testify.

71. Each child expressed essentially the same concerns and experience relating to Ms. Jaet as reflected in Dr. Gerena's report.

72. M.J., who just turned seven years old, is an adorable, angelic-looking child who wants to live with her Mom, whether here in the United States or in Mexico. She said she would want to visit with her Dad if he didn't scream or hit her.

73. A.J., nine years old, testified that he wants to live in the United States because it is nicer than Mexico. He said if his Dad lived in the United States he would want to see his Dad once a week and would want his Dad to buy a house near his Mom so A.J. could visit and have a room in the house.

74. A.J. also stated that Mexico is not safe because a boy was kidnapped, information he obtained from his Mom.

75. A.J. would feel better around his Dad if Mr. Jaet received help and A.J. would want to spend more time with him. He said his Dad needed help with anger, screaming and hitting.

76. S.J., who turned eleven earlier this year, said she felt tension all weekend during visitation with her father. She said she missed her Mom all weekend.

77. S.J. said her Mom is very important to her. She feels safe with her Mom. And she feels safer in the United States as opposed to Mexico.

78. S.J. said she was relieved when her parents got a divorce. When asked how often she wanted to see her Dad if she lived with her Mom in Mexico, she said twice per month.

79. The children all expressed a desire to remain in the United States with their mother.

80. Any psychological harm inflicted upon the children during their last five months in Mexico are most likely due to the pending divorce and conflict between their parents, though Mr. Jaet clearly engages in corporal punishment and angry verbal outbursts in disciplining the children.

81. These outbursts by Mr. Jaet have caused anger and resentment toward Mr. Jaet by the children.

82. Both parents are at fault in exposing the children to details of the court proceedings here and in Mexico and to details of the deterioration of the parents' relationship.

83. If the children are returned to Mexico, although Alan clearly has a temper and has

12

engaged in corporal punishment of the children (spanking and verbal condemnation), the Court does not find by clear and convincing evidence that the children will experience a grave risk of harm.

## II. CONCLUSIONS OF LAW[6]

### A. Motion to Strike

Before reaching legal conclusions regarding the Petition, the Court must first resolve the only remaining pending motion, Respondent's motion to strike various allegations contained in the Petition. Respondent argues that various allegations about her behavior should be considered "impertinent or scandalous" under Rule 12(f) of the Federal Rules of Civil Procedure. The Court notes that some of these allegations regarding Respondent's behavior are not subject to being stricken, but are merely argumentative, while others are subject to being stricken under this standard.

In particular, the Court denies the motion to strike as to paragraphs 7, 13, 21, 27, 28, 31, 36, 37, 57, 58, 59, and 68 as these allegations are argumentative about the events leading up to the retention of the children in Florida and legal actions taken thereafter, but are not impertinent nor scandalous. As to the allegations that Ms. Jaet's parenting skills were lacking, the Court does strike those allegations in paragraphs 44 (striking only the words at the end of ¶ 44 "while the Respondent was effectively an absentee parent"), 53, 54, 55 and 56 regarding Ms. Jaet's fitness to be a parent.

---

[6] Any of the foregoing conclusions of law that may represent factual findings are adopted as factual findings.

## B.  Governing Legal Standard

Under the Convention and ICARA, this Court's role is limited to determining whether the Petitioner has met his prima facie case and then whether Respondent can establish one of the narrow defenses.  "When a parent files a petition for the return of a removed child, the first question courts must ask is whether the removal was wrongful. If so, the child must be returned 'forthwith' unless the respondent establishes one of the affirmative defenses enumerated in the Convention."  Baran v. Beaty, 526 F.3d 1340, 1344-45 (11th Cir. 2008).  In this case, Ms. Jaet asserts the defense that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Convention, Article 13(b). As the parent opposing return on this basis, she must prove this defense by clear and convincing evidence.  42 U.S.C. § 11603(e).

To meet a prima facie case, Petitioner needs to show that the children's habitual residence immediately before the date of retention was in Mexico; that Respondent's retention of the children in the U.S. is in breach of Petitioner's custody rights under Mexican law; and that Petitioner was exercising his custody rights at the time of the retention.

Based upon the evidence presented at trial, the Court concludes that Petitioner has met his initial burden by showing that the children resided in Mexico immediately before they arrived in Florida.  In addition, it is clear that based upon Mr. Jaet's custody rights under the Mexican divorce decree, Ms. Jaet was supposed to return the children to Mexico on or about July 15, 2008.  This Court lacks jurisdiction to question the

14

validity of the final judgment of the Mexican court. Finally, Mr. Jaet had made plans to exercise his custody rights for the second half of the summer commencing on or about July 18, 2008, had paid the school tuition and maintained the children's residence. Thus, Petitioner has presented a prima facie case under the Convention and ICARA.

### C. Grave Risk Affirmative Defense

Ms. Jaet has plead the affirmative defense to return that: "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, Article 13(b). As noted above, as the parent opposing return, Ms. Jaet must prove this defense by clear and convincing evidence. 42 U.S.C. § 11603(e).

The evidence presented at trial is subject to various interpretations. Petitioner, Mr. Jaet, acknowledges that he has spanked the children with an open hand as a disciplinary measure. Respondent, on the other hand, reports a years long cycle of spousal abuse by Petitioner, primarily psychological in nature, and child abuse, consisting of harsh discipline and angry verbal outbursts by Petitioner which have traumatized the children. Petitioner correctly notes that Respondent never made any official report of any abuse until just prior to her departure from Mexico after their divorce became final. More importantly, there is no evidence that Petitioner ever engaged in physical discipline beyond spanking with an open hand, pinching of the face and/or jaws, and grabbing a shoulder or arm to move a child. In the absence of any documented instances of child abuse, it is difficult for this Court to find a grave risk of harm exists if the children are returned to Mexico.

The Court also must note that a significant part of the testimony at the trial concerned behavior of the parents that is irrelevant to the Court's limited determination of grave risk under the Hague Convention.  Allegations about name-calling, adultery, drug use, alcohol abuse, and exposure of the children to court proceedings indicate serious problems within this family.  However, whatever the extensive problems between Mr. and Ms. Jaet and the leakage of this psychological toxicity upon the children, the Court cannot conclude that there is clear and convincing evidence that the children will face a grave risk of physical or psychological harm if returned to Mexico.

The children themselves reported much of the verbal abuse toward their mother and various instances of physical and verbal discipline by the father upon them to Dr. Gerena, which is contained in her report.  Exhibit 29.  The Court heard testimony from the children in camera wherein they said similar things to the undersigned.  Though the children wish to stay in the United States, their testimony appears to be due in part to undue influence by their mother, rather than fear of having their father in their life.  de Silva v. Pitts, 481 F.3d 1279, 1286 (10th Cir. 2007) ("if a court determines that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account," citing In re Robinson, 983 F.Supp. 1339, 1343-44 (D.Colo.1997)).[7]

---

[7] As discussed in the Court's ruling on the objection to the children's in camera testimony, the Court heard the testimony as it is relevant to Respondent's § 13(b) defense of grave risk of harm, rather than the child's wish exception which was not pled in Respondent's Answer.  Blondin v. Dubois, 238 F.3d 153, (2nd Cir. 2001).  See also Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 279-280 (3rd Cir. 2007), a case involving the child's wish exception rather than the grave harm exception, where the court disregarded an intelligent ten year-old's desire to remain with father in United States.  Numerous other decisions where a court heard from the minor children, the child's wish was not followed.

The only substantiated allegations of physical harm involve disciplinary spanking, a situation not akin to the grave risk of physical harm contemplated by the Hague Convention. The abuse in this case is a concern but does not rise to the serious level of abuse prohibiting the children's return to Mexico. Simcox v. Simcox, 511 F.3d 594, 607 (6th Cir. 2007). Cultural differences alone can account for some of the physical discipline. This Court cannot substitute its view of child rearing for those of parents in other countries.[8] Mexican authorities, including school teachers and therapists, should be able to report any future instances of abuse that merit governmental intervention. Exhibits 8 and 10.

As for psychological harm, the Court cannot conclude that Ms. Jaet has met her burden to show by clear and convincing evidence that there is a grave risk of psychological harm if the children are returned. In her supplementary closing arguments [DE 48], Ms. Jaet seeks the Court to consider the harm to the children if she does not return to Mexico with them, as the testimony in the case indicated that her life in Mexico was "destroyed." As in Kufner v. Kufner, 480 F.Supp.2d 491, 515 (D.R.I. 2007), *aff'd*, 519 F.3d 33, 41 (1st Cir. 2008), this Court also finds that the children have developed a strong relationship with their mother that if severed could result in severe psychological harm to the children.[9] However, the Court does not find any legal

---

[8] Nor can the Court rule based upon what is in the best interest of the children's future opportunities.

[9] The Court recognizes that Kufner involved different facts, in that the mother had lost a temporary custody determination by the German court system and the mother had been barred from returning to Germany, neither of which facts apply to the present case. 480 F.Supp.2d at 514-515.

17

authority to allow this factual finding to impact its legal conclusion regarding the Respondent's burdens under the Hague Convention as there is no legal bar to her return to Mexico with the children.

This Court is left with the conclusion that the Hague Convention requires that the children be returned to Mexico. However, the Court does believe that undertakings are necessary to help prevent a grave risk of harm in the future.

### D.  Undertakings

First, with regard to psychological counseling, Petitioner testified that he has already investigated and planned for the children to begin therapy upon their return to Mexico to deal with their anxiety. Although it is not clear whether this Court has the authority to condition return with an undertaking that Petitioner undergo anger management therapy for himself, the Court would hope that he would do so on his own accord and for the benefit of the children.

Second, Petitioner has stated to the Court that he will dismiss a pending criminal court action in Mexico against Respondent for her not returning the children to Mexico last summer. Petitioner also stated that he has a family court action against Respondent for enforcement of the custody decree. Although Respondent believes there are additional actions filed against her with regard to her continuing to live with the children at the residence specified in the divorce decree, Petitioner stated that he is only seeking to enforce the divorce decree, not to deprive Respondent of her rights under the decree.

18

## III. CONCLUSION

It is the intent of these Findings of Fact and Conclusions of Law, and the accompanying Judgment, that the Mexican divorce decree be given full comity and these Findings and Conclusions, and the Judgment, in no way seeks to modify the rights of the parties under that decree.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. The Court will enter a separate Final Judgment granting the Petition for the Return of Minor Children consistent with the Court's Findings of Fact and Conclusions of Law;

2. The Return is conditioned on the undertaking that the children receive psychological counseling to deal with the divorce of their parents and their re-integration into their Mexican school and life;

3. Petitioner shall immediately withdraw any criminal complaints against Respondent in Mexico relating to her retention of the children in the United States to facilitate her return to Mexico, and shall file in this Court written confirmation of the dismissal of all criminal proceedings against Respondent in Mexico relating to her retention of the children in the United States as soon as possible, but no later than 30 days;

4. Petitioner shall also undergo anger management counseling or some other form

of counseling to deal with his angry outbursts toward the children.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, on this 5th day of January, 2009.

_____
JAMES I. COHN
United States District Judge

Copies furnished to:

Dolly Hernandez, Esq./ Robert Kohlman, Esq.
Iris Barzvi Jaet, pro se (via email)